OGDEN CITY, a Municipal Corporation, Appellant, v. WEBER COUNTY, a Municipal Corporation, Respondent.

**No. 1391.**    (72 Pac. 433.)

1. **Paupers:  Provisions for Relief:   Non-Residents:  Duties of County.**

   Under Revised Statutes 1898, section 511, subdivision 40, making it the duty of the board of county commissioners to provide for the maintenance of indigent sick and dependent poor of the county, non-resident paupers, whether living in a different county or without the State, but who happen to come within the county, are not excluded from the provisions of the act.

2. **Same:  Such Statutes Liberally Construed.**

   Revised Statutes 1898, section 511, subdivision 40, providing for the maintenance of paupers, was enacted in the interests of hu-

   26 Utah 9

manity, and must be liberally construed to effectuate the benevolent policy of the Legislature.

3. **Same: Relief Furnished by City: Recovery from County.**

    Where the board of county commissioners upon proper application being made to it, refuses to provide necessary relief for an indigent sick or dependent poor person found within the county, in accordance with the duty imposed on it by statute, and such relief is furnished by a city, the city may recover from the county the expenses necessarily incurred by it in furnishing the relief.

4. **Same: Facts Held to Justify Action by City.**

    A complaint alleging that a non-resident, seventy-four years of age, sick, destitute, in need of food, clothing, and medical attendance, and having no means of furnishing himself with the necessaries of life, applied to plaintiff city for relief, and was cared for by it, on the refusal of the county commissioners to take charge of him, showed a sufficient emergency to authorize plaintiff to act, and entitle it to recover from the county for money necessarily expended in the relief of the applicant.

5. **Same: Mandamus Not Exclusive Remedy.**

    A city furnishing relief to an indigent sick and dependent poor person, on the refusal of the county commissioners to furnish such relief, may maintain an action to recover from the county the sum expended by it on the refusal of the county commissioners to reimburse it for means necessarily expended, and need not resort to mandamus against the commissioners.

    HART, District Judge, dissenting.

## (Decided May 9, 1903.)

### Appeal from the Second District Court, Weber County.—*Hon. H. H. Rolapp,* Judge.

Action to recover a certain sum for the care and maintenance of a sick and dependent poor person. From a judgment in favor of the defendant, plaintiff appealed.

REVERSED.

*John E. Bagley, Esq.,* for appellant.

*George Halverson, Esq.,* for respondent.

BARTCH, J.—This action was brought to recover a certain sum for the care and maintenance of a sick and dependent poor person. The allegations of the complaint show, substantially, that the parties to this suit are municipal corporations; that one Thomas Ray, a non-resident, on February 9, 1902, he being then seventy-four years of age, applied to Ogden City for aid and assistance; that he was physically infirm, sick, destitute, and in need of food, clothing, and medical attendance; that he had no means with which to furnish himself with care or necessaries of life; that Ogden City notified Weber county of his totally helpless condition, and demanded that the county take charge of and care for him; that the county, through its commissioners, refused to do so; and that thereupon the city cared for him, and, in doing so, expended the sum of $17.42, for which sum a claim was duly presented to the board of commissioners of said county, and by them rejected, and payment therefor refused. To this complaint the defendant interposed a general demurrer which was sustained, and the action dismissed. This appeal is from the judgment.

The principal question presented is whether, under our laws, it is the duty of the county commissioners to provide and care for transient or non-resident poor found within their county in a helpless condition. The statutory provisions relating to the duties and powers of boards of county commissioners are, so far as material here, as follows: Section 511, Revised Statutes 1898, subd. 40, reads: "To provide for the care and maintenance of the indigent sick and otherwise dependent poor of the county; to erect, officer, and maintain hospitals and poorhouses, in its discretion, or otherwise to provide for the same; and for such purposes to levy the necessary property tax, or poll tax, or both; provided, that the board of county commissioners shall appoint (not let to the lowest bidder) some suitable

person or persons to take care of and maintain such hospitals and poorhouses, and the board shall also appoint (not let to the lowest bidder) some suitable graduate in medicine to attend such indigent sick or other dependent poor." Subdivision 41 reads: "To provide a farm in connection with the county hospital or poorhouse, and make regulations for working the same." And as to what are proper county charges, section 538, subd. 7, provides: "The necessary expenses incurred in the support of the county hospitals, poorhouses, and the indigent sick and otherwise dependent poor, whose support is chargeable to the county."

It will be noticed that, under subdivision 40, it is the duty of the board of county commissioners "to provide for the care and maintenance of the indigent sick and otherwise dependent poor of the county." It is insisted for the respondent that this language does not include non-resident paupers; that the statute was intended to confer jurisdiction upon a board of county commissioners to provide and care only for paupers who are residents of the county; and that such board owes neither a legal nor a moral duty to non-resident paupers. Carrying this contention to its legitimate conclusion, and in view of the action of the board in this instance, it means that, no matter what the exigency, such a board owes neither a legal nor a moral duty to a pauper who is not an actual resident of the county of such board, even though he may have an actual and legal residence in some other county of the State, and even though such pauper may have met with a misfortune from which he would perish before aid from the county of his residence could reach him. This, indeed, would be a cold, rigid, and harsh construction of the statute, and one which cannot receive our judicial sanction. It cannot be, nor does the context warrant us to hold, that the Legislature, by the use of the words "dependent poor of the county," intended to withhold aid in cases of emergency from such unfortunate beings in all counties except the county of legal residence. There is no

express language in the statute which renders such a construction imperative, and, in the absence of such language, we must refrain from imputing to that co-ordinate branch of the government an intent so much at variance with the dictates of humanity and all human sympathies.   If, then, the statute, in such helpless cases, does not exclude non-residents of the county where application for aid is made, who are residents of other counties of the State, then, by parity of reasoning, does it not include, under similar circumstances, unfortunates who may chance to have their legal residence without the State?   The same provisions of the statute apply in either case.   Nor is there anything in any provision of law on this subject which militates against our interpretation of the statute.   The enactment was made in the interests of humanity and mercy, and must receive a liberal construction, so as to carry into effect the humane and benevolent policy adopted by the Legislature.   Evidently the intention of the law-makers was to provide a mode for the relief of poor and suffering humanity, and there is no requirement that the recipient of the bounty must have an actual legal residence in the county before the board of commissioners can act.   Where a person is found within a county who is "indigent, sick and otherwise dependent poor," it is the duty of such a board to render such aid and assistance as necessity demands.   Where, however, the applicant for aid is a non-resident, it is doubtless also the duty of such board to remove him, as soon as practicable, to the county or State of his residence.   If, in any case, the emergency is such as to require it, and upon proper application the board refuses to act, and some other party then furnishes necessary and requisite aid, we, in such event, see no good reason why the county, refusing to perform its statutory duty, should not be held liable for the expenses necessarily incurred.   We think, under our laws, such liability, under such circumstances, results, by implication, because of the dereliction of legal duty.   "Where it is by statute

made the duty of overseers to relieve the poor in distress, the manner in which this relief shall be administered is left, in the first instance, to the sound discretion of the overseers, who are bound to act reasonably and in good faith. This rule applies not only to such paupers as have gained a legal settlement, but also such as are casual residents. And where it is thus made their duty to relieve those requiring support, it is within the scope of their official powers to settle and pay claims made against their town on account of expenses incurred in another town in supporting their paupers." 18 Am. and Eng. Ency. Law (1 Ed.), 770. And "where a town is made liable by statute for the support of the poor, it is bound, after notice and request of the proper officers, for necessary expenses incurred by an inhabitant of the town for the relief of a pauper." 18 Am. and Eng. Ency. Law, 812. In Board of Com'rs v. Mc-Fall, 35 Pac. 691, Mr. Justice Sullivan, speaking for the Supreme Court of Idaho, in construing a similar enactment, said: "The statute under consideration is one of mercy and benevolence, and must be liberally construed, with a view to carry into effect its beneficent objects and designs. We think the provisions of said chapter are broad enough to include all indigent sick within a county. The statute does not require that such persons reside within the county any certain length of time, or that they possess any particular qualification, other than that of being indigent sick or otherwise dependent poor. A citizen of another State who comes into this State and becomes sick, and is pecuniarily unable to provide for himself proper medical aid, attendance, and support while so sick, comes within the provisions of said chapter." In Seagraves v. City of Alton, 13 Ill. 366, Mr. Chief Justice Treat, speaking for the court, said: "Where the law imposes an obligation on a corporation which it refuses to discharge, it may be held liable civilly at the suit of a party who sustains damages in consequence of its refusal. In legal contemplation, a corporation assumes to perform what its

charter enjoins upon it, and it is subject to answer in a proper action for its default.    And the law is now well settled, however it may have been formerly, that an action of assumpsit may be maintained against a corporation upon an implied contract. . . . Paupers are not to be turned over to the uncertain charities of individuals.    The law makes them a charge on the corporation, and it is bound to provide them a comfortable support.    If she will not do this in the first instance, individuals may provide for their necessities, and look to the corporation for remuneration.''    18 Am. and Eng. Ency. Law, 809, 810; Trustees v. Ogden, 5 Ham. 23; Overseers of Taylor v. Overseers of Shenango, 114 Pa. 394, 6 Atl. 475; Knight v. Fairfield, 70 Me. 500; Stone v. Town of Glover (Vt.), 15 Atl. 334; Board of Supervisors v. Gilbert (Miss.), 12 South. 593; Shreve v. Budd, 7 N. J. Law 431; Overseers v. Overseers, 3 Serg. & R. 117; Danforth v. Turnpike Road, 12 Johns. 227; Bank of Columbia v. Patterson's Adm'r, 7 Cranch 99, 3 L. Ed. 351; Overseers v. Overseers (Pa.), 18 Atl. 549.

We are of the opinion that there was such an emergency in the present case as justified the plaintiff in furnishing aid and assistance, upon the refusal of the board of commissioners to do so, and that, under the circumstances, the defendant became liable for the expenses incurred; there being nothing to show that anything unnecessary was done or furnished.

Nor, under the facts and circumstances disclosed by the record, was the appellant bound, instead of furnishing immediate relief, to resort to mandamus to compel the respondent to perform its duty.

. The action of the court in sustaining the demurrer and dismissing the suit was therefore erroneous, and the judgment must be reversed, with costs, and the case remanded, with directions to the court below to overrule the demurrer and proceed in accordance herewith.    It is so ordered.

BASKIN, C. J., concurs.

HART, District Judge.—I am unable to concur in the foregoing opinion. While the humanity and sympathy involved therein are commendable, still it is a question of the legal, and not the moral, duty of the defendant county. Its only duty to paupers is that imposed by statute.

It should be noted that subdivision 40, section 511, Revised Statutes 1898, is substantially the same as subdivision 5, section 21, chapter 131, page 522, Laws 1896; the same being an amendment of, or substitution for, subdivision 6, section 187, Comp. Laws 1888, as follows: "(6) To provide for the care and maintenance of the indigent sick or otherwise dependent poor, transients and residents of the county, erect, officer, and maintain hospitals and poorhouses in their discretion therefor, or otherwise provide for the same; and for such purposes, annually at the time appointed by law for the levying of taxes for county purposes, to levy the necessary property tax therefor," etc.—substantially same as present statute.

Our present statute empowering the board of county commissioners "to provide for the care and maintenance of the indigent sick and otherwise dependent poor of the county" would seem by its very terms to exclude the contention made by the plaintiff city that this includes transients or the poor of some other county or State. "The indigent sick or otherwise dependent poor of the county" are those belonging to the county by residence or settlement in the county, and not transients temporarily in the county, and having a residence or settlement in some other county of this or some other State. But assuming, for the purposes of the argument, that there is some doubt or ambiguity as to the meaning of the language in question, reference to the original statute embodied in this section of the Code would then be permissible for the purpose of making clear or aiding the construction to be given it. Meyer v. Western Car Co., 102 U. S. 1, 26 L. Ed. 59; Viterbo v. Friedlander, 120 U. S. 707, 7 Sup. Ct. 962, 30 L. Ed.

776; United States v. Lacher, 134 U. S. 624, 10 Sup. Ct. 625, 33 L. Ed. 1080; Bate Refrig. Co. v. Sulzberger, 157 U. S. 1, 15 Sup. Ct. 508, 39 L. Ed. 601; Pratt v. Street Com'rs (Mass.), 2 N. E. 675; Heck v. State (Ohio), 9 N. E. 305; Black, Int. of Laws, sec. 136. Subdivision 6, section 187, Comp. Laws 1888, referred to in the footnotes to the corresponding section of the Revised Statutes of 1898, reads: "The indigent sick or the otherwise dependent poor, transients and residents of the county." Is the present statute, from which the words "transients and residents" are omitted, to receive the same construction as the earlier statute? In other words, did the Legislature of 1896, which amended or changed the former statute, intend to make no change when it enacted substantially what is now subdivision 40, section 511, Revised Statutes 1898? It is true that Logan Co. v. McFall (Idaho), 35 Pac. 691, expresses the view that a statute similar to our own is broad enough to include the transient poor of a county; yet the same is largely *dictum,* for the reason that, even if the opposite conclusion had been reached, the decision of reversal would have been the same, under the particular facts of that case. It would seem clear that the change in phraseology of this statute was intended to exclude transients from the benefits of support by the county. If not, why make doubtful that which was before clear? The obligation of a county to support the indigent sick or otherwise dependent poor is purely statutory, and the case must fall fairly "within the liability created pursuant to and in the manner prescribed by the statute," to render the county liable. Lander Co. v. Humboldt Co. (Nev.), 32 Pac. 849; Patrick v. Town of Baldwin (Wis.), 88 N. W. 274; Hamlin Co. v. Clark Co. (S. D.), 45 N. W. 329; Board of Comr's Sweetwater Co. v. Board of Com'rs Carbon Co. (Wyo.), 44 Pac. 66; St. Luke's Hospital Ass'n v. Grand Forks Co. (N. D.), 77 N. W. 598; Board of Com'rs of Rio Grande Co. v. Phye (Colo. Sup.), 59 Pac. 55; Hamilton Co. v. Meyers (Neb.), 37 N. W. 623; Washoe Co. v. Eu-

reka Co. (Nev.), 60 Pac. 376; Mansfield v. Sac Co. (Iowa), 14 N. W. 73; 22 Am. and Eng. Ency. Law (2 Ed.), 1000. That the liability of a county for the support of the poor is purely statutory, and depends upon the terms of each particular statute, is evident from the following early decisions, some of which are cited and relied upon by plaintiff in this case: Overseers of Taylor v. Overseers of Shenango, 114 Pa. 394, 6 Atl. 475; Kelly Tp. v. Union Tp., 5 Watts & S. 535; Minklaer v. Rockfeller, 6 Cow. 276; Rouse v. Co. of Peoria, 2 Gilman 99; Palmer v. Vandenbergh, 3 Wend. 193; Everts v. Adams, 12 Johns. 352; Otis v. Strafford, 10 N. H. 352; Bentley v. Com'rs, 25 Minn. 259; Lamson v. Newburyport, 14 Allen 30; Kellogg v. St. George, 28 Me. 257. A similar rule prevails in reference to the liability of a county for the support of its prisoners. Hendricks v. Chautauqua Co. (Kan.), 11 Pac. 450. The decision of Board of Sup'rs of Lee Co. v. Gilbert (Miss.), 12 South. 593, cited by plaintiff, is so brief that it cannot be determined whether it is supported by statute, or whether mere sentiment is permitted to outweigh logic. Knight v. Fairfield, 70 Me. 500, was probably decided upon a statute, although the decision, upon its face, does not so show, except that Lamson v. Newburyport, supra, is cited in support of the opinion.

Even if we should take the view that our statute includes support for transient paupers, another serious question is whether recovery upon an implied promise could be had against the county by one who had voluntarily rendered support to such persons. Some cases have been decided squarely on the ground that an action on an implied contract cannot be maintained against a corporation simply because it is a corporation, and not a private person. As was pertinently asked in the case of The Baptist Church v. Mulford, 3 Halst. 182, "could there be a greater anomaly than that the law should imply a promise against a natural person for the sake of justice, and not against a corporation, when the reason is the same?" Without discussing the difference, if

any, between actions on implied contracts against private corporations and public or municipal corporations, and passing to a consideration of assumpsit against public corporations for the support of paupers, distinction should be noted between cases where an implied promise has been raised by reason of some act or acts by an agent of the municipality from which a contract can be reasonably inferred (Beach v. Town of Neenah, 90 Wis. 623, 64 N. W. 319), and cases where assumpsit against a municipality is upheld merely upon the performance by a private person of a duty resting upon the corporation (Seagraves v. City of Alton, 13 Ill. 370.  Contra, Patrick v. Town of Baldwin, supra, and other cases cited; also 22 Am. and Eng. Ency. Law (2 Ed.), 1008, 1011, and cases cited).  According to the opinion in Gourley v. Allen, 5 Cow. 644, assumpsit would lie for services performed in an emergency by a private person for a pauper, under the system in vogue in England. In that case the difference is pointed out between the laws of the two countries; the English parish overseers being appointed pursuant to 43 Eliz., c. 2, and authorized to raise money sufficient for their needs by "making a rate" from time to time.  Under that system "they can never, therefore, allege a want of power or means to afford the required relief."  In that case the conclusion is reached that "we cannot take the English authorities for our guide in these matters, because the office and duties of our overseers of the poor are very different from the office and duties of the parish overseers of England."

Section 2593, Revised Statutes 1898, limits the rate of taxation for all county purposes not to exceed five mills on the dollar, and if the doctrine is to be established that all paupers, residents and transients, carry with them an implied credit to bind the county for all necessary food, clothing, medicine, lodging, medical and other care, not furnished by the county upon application, it would be possible for designing persons to exhaust the entire revenue of a county for the support of

such paupers, and leave no funds in the treasury for any other county purpose. Besides, if every pauper is authorized to pledge the credit of a county for necessaries not furnished by the county after demand, it would transfer the question of determining who should be supported, and the extent and manner thereof, from the board of county commissioners to the forum of the courts. Instead of having a uniform administration of public bounty, equalized among the applicants according to their respective needs and the financial ability of the county, we would then have a fluctuating standard, varying according to the judgment or prejudices of the jurymen trying such cases. Again, if a mere voluntary courtesy to a pauper will uphold assumpsit against a county, the principle must be declared exceptional, and not to be extended by analogy to the voluntary performance by a private person of any neglected duty developing upon a county, such as repairing bridges and highways. The obligations of a county would have to be restricted also to the financial ability of the county, in view of all its other duties. While such cases as the one at bar appeal strongly to the humanity of a court to adopt a rule which will afford immediate relief to such unfortunates, the question for us, after all, is not what laws should be enacted by our Legislature, but what have been enacted. Other States, older and more populous than our own, have elaborate ''poor laws,'' requiring each county to take care of its own poor and give temporary relief to transients. In Utah we have not felt such urgent need for a complete poor law. The people have been thrifty, and very generally owners of their own homes. To a large extent, wealth has been equally divided. It is also the history of the State that there have been organized and existing in nearly every town or city societies for the relief of the dependent poor. But we have now reached a stage of growth when, for our larger cities and railroad centers, there is urgent need of additional legislation for the support of the poor. The remedy is with the Leg-

islature, and not with the courts. It is our duty to construe, and not make, the laws. Transient poor should at least receive temporary care, but we do not feel at liberty to read the word "transient" into the statute after the same has been deliberately stricken out. Legislation should render unnecessary any contention between city and county over which should take charge of the poor therein. If there be danger that overseers of the poor will neglect their duty, and if mandamus to compel performance of such duty is an inadequate remedy, which it would be in all emergency cases, at least, then a rule for relief should be adopted which will safe-guard the county against extravagance and imposture, and at the same time give an effectual remedy to the needy poor. The Legislature, and not the courts, should determine under what circumstances any person may render assistance to a pauper at the expense of the county. Certainly a system can and should be devised that will not permit a haggling between city and county as to which shall render a little assistance to such unfortunates as Thomas Ray, or the recurrence of such an instance as involved in Mappes v. Iowa Co. (Wis.), 1 N. W. 359, of the blind old lady, nearly 100 years old, driven from "post to pillar, and pillar to post," between the penurious poorhouse and her unnatural offspring. Such cases go far to prove that it was not a mere pigment of sympathetic fancy on the part of Dickens in creating in Our Mutual Friend the character of Betty Higden, the brave little creature to whom the "good Samaritan" had become a "pursuing fury," and who fought all her life against the parish poorhouse, and who wanted to die free from it, willing in her fatal illness to give her last penny as a bribe to the officer not to take her to the poorhouse, and whose dying request was "nor let the parish touch me, nor yet so much as look at me."

I am of the opinion that the judgment of the trial court should be sustained.