## CACHE VALLEY GENERAL HOSPITAL v. CACHE COUNTY.

No. 5864.   Decided May 6, 1937.   (67 P. [2d] 639.)

280

*George C. Heinrich,* of Logan, for appellant.

*L. E. Nelson,* of Logan, for respondent.

WOLFE, Justice.

One Frank Palmer for a long time prior to May 3, 1934, was an indigent and dependent poor person of Logan City. Between May 3 and 19, 1934, he was treated at the plaintiff hospital at the behest of defendant for amputation of a toe and on May 26, 1934, plaintiff was paid the bill for hospitalization in full by defendant without objection. On May 19th, Palmer was released from the Hospital and taken by his doctor, a Dr. Hanson, to the Temple Square Hotel managed by one Rumble. He had previously resided here and the county had paid for a portion of his care after he was taken with his first sickness. Most of the time Rumble "kept him free." On May 19th, the same day he was released, he became suddenly and critically ill and Rumble testified he feared he might die at the hotel. After several unsuccessful attempts to locate Commissioner Worley for authorization to return Palmer to the hospital, Mohr, county clerk, called an ambulance and directed it to call for Palmer and deliver him to plaintiff hospital for further attention. This was done. Two or three days thereafter, Palmer's leg was amputated. Palmer remained in the hospital for several months after the operation. On September 17, 1934, for the first time., Dr. Merrill for the plaintiff presented its bill for four months' hospitalization. No charge was made for treatment. No objection to this bill was made by the county at that time and Dr. Merrill kept Palmer for another month, to wit, until October 19, 1934. The county in January of 1935 finally paid one-third of the bill. Plaintiff sues in this action for the other two-thirds, or $385. It sues on two counts—one on an implied contract and the other apparently on three theories: First, that there was a legal duty on the county because Palmer was an indigent; and, secondly, because of an emergency; and, thirdly, because the county had acquiesced and ratified Palmer's care at the hospital. There is also injected in the second count that the hospitalization was at the "special instance

and request of defendant." The contention that there is a legal duty is based on the case of *Ogden City* v. *Weber County*, 26 Utah 129, 72 P. 433. We shall consider that case later. It is also urged that the commissioners are estopped from denying liability. Estoppel is contended for on the ground that Mohr told the commissioners he had directed the return of Palmer and they did not repudiate to plaintiff Mohr's action, and furthermore, that they knew of and discussed Palmer's being at the hospital without notifying Dr. Merrill that they would pay only one-third of his bill and that on September 17th, when he did present a bill in full up to that time, no objection was made, and that not until January of 1935 did the county refuse to pay more than one-third of the bill.

It should be noted that neither count proceeds on the theory that the period from May 19 to October 19, 1934, was chargeable to the county because it came under the authorization given on May 3d to the hospital to take care of Palmer. The fact that Palmer was taken care of by the hospital from May 3d to May 19th is mentioned in the complaint, but only as a fact in inducement to show that Palmer was an indigent and that the county had recognized him as one, and that therefore there was a liability in law for that reason to take care of him. Also it was pleaded as a fact in the estoppel to show that for such period the county had paid the hospital in full, from which it is contended that it could rely on that fact to conclude that it would be paid in full for the period from May 19th to October 19th, it being claimed that the hospital had no knowledge that the commissioners had a general rule to pay only one-third of the hospital expenses. But there is no count based on the theory that the period from May 19th to October 19th was in fact a necessary continuation of the period of May 3d to May 19th, and that the second period did in fact come under the authorization given to render Palmer hospitalization starting from May 3d—the few hours he was absent from the hospital not

breaking the continuity of the authorization given for the May 3d treatment, especially since Palmer had apparently not been cured, but suffered a relapse. The plaintiff's counts are based on a new contract or duty arising out of the claimed emergency of May 19th or an estoppel from asserting a nonliability.

As to the implied contract in fact. This contention is based on the ground that Mohr had authority in cases of emergency where the commissioners could not be reached to authorize care; that for the eight years he was in office he had instructions from consecutive different commissioners to take it upon himself in strictly emergency cases to do the best he could. He said they told him to "use your own judgment." Several times in the case of transients he had used his own judgment and no objections had ever been raised by the commissioners. The court held that Mohr did not have authority "in emergency cases and particularly in this case to authorize or incur the indebtedness herein sued upon, and this indebtedness was incurred by said indigent without any authorization by the County Commissioners or any person authorized to act for them and on their behalf." The finding divides itself into two parts:
(1) That Mohr had no right or authority in emergency cases; (2) that he had no right or authority to incur the indebtedness herein sued on.

The first finding that he had no authority is somewhat harsh, but this being a law case and the court being the fact finder, we cannot say that it should be overturned. On cross-examination, Mohr testified that there was no record of such authorization, although he was clerk. ■ He states it was "understood" by the commissioners and arose in one or several unrecorded discussions. He testified that it was the practice. Commissioner Muir testified that the only thing which was spoken of between the commissioners and Mohr was that he was to have authority to take care of small bills of transients, such as gasoline, meals,

etc., when the commissioners were not in, so that such transients could "get out and move on." And it is in regard to just such transactions that Mohr testified the commissioners paid the bills and made no objection to what he had done. While it seems natural and necessary that some one should have authority to consign an emergency case to the hospital if none of the commissioners were available and that if it were done in such case to save a life it would take but little evidence for the court to find that such person had authority, we cannot say that the finding of the court was not sustained by the evidence if he chose to take the view of the evidence which he evidently did.

As to the second part of the finding that Mohr had no authority to incur the indebtedness sued on, it is supported by the fact that the court found that he had no authority in any case to consign an indigent case to the hospital; also by the evidence that in no event would Mohr have authority to bind the county for hospitalization beyond a period of care required for and by the emergency. It would be further supported if finding No. 5 to the effect that an emergency did not exist at the time when Palmer was returned to the hospital was correct.

Thus, the finding that Mohr had no legal authority to bind the county and there could arise no implied contract in fact from his act in directing the delivery of Palmer to the plaintiff hospital is supported by evidence.

Was there a contract implied in law? Plaintiff asserts that the county had the duty to care for Palmer. This contention seems to be based on the following: (1) That it had in fact recognized him as an indigent and already assumed his care; and (2) that the law imposes on it this duty so that a third party who performs it may sue for necessaries and care, much like a third party supplying a wife with necessaries for the family may sue a husband who has not expressly or impliedly contracted.

Section 19-5-55, R. S. 1933, provides:

"They [the commissioners] may provide for the care, maintenance and relief of all indigent sick or otherwise dependent poor persons who have lawfully settled in any part of the county, including that territory or portion thereof lying within the limits of any incorporated city or town situated in the county; and it is hereby made the duty of each board of county commissioners to provide such care, maintenance and relief for the indigent sick and dependent poor, whether found within or without the corporate limits of incorporated cities or towns."

While this statute has been changed in some respects from that contained in the Revised Statutes of 1898 on which the case of *Ogden City* v. *Weber County* was based, the mandatory portion is just as strong in this act as in that of the revision of 1898. But it is pointed out when Palmer was taken to the hospital and prior thereto there was in effect a statute limiting the levy for the care of indigents, county hospitals, etc., to one mill (Rev. St. 1933, 19-5-62), whereas in the 1898 revision (section 511, subd. 40) it was provided that "for such purposes to levy the necessary property tax, or poll tax, or both." Under an assessment of $23,000,000, the amount which could be raised for needy and indigent persons would be $23,000. If the county was required to pay the bills of all persons who took care of claimed indigents or emergency cases, no sort of allocation of this $23,000 could be adhered to. Planning even approximately would be impossible. The county shows that it would require on an average of $69,000 a year to take care of the indigent; that it gets only one-third of this amount from its one mill tax.

A requirement imposed upon an official or board to expend money is not a duty past the amount available. If the Legislature creates a board or office and requires it to function by the expenditure of money and no money is appropriated, unless there is some basis upon which the board of examiners may allow a deficiency, there can be no duty to function. A duty to function without means to function is a contradiction. It is argued that in this case the hospital was entitled to its money as long as

there were funds available and that the commissioners could not pay just the one-third which would be the hospital's proportion as the available means bore to the entire load. If this is true, it would mean that the funds would be exhausted by those who were first served and those who came afterward could obtain no relief. Moreover, the county answers that as a matter of fact it had already overdrawn its budget for this purpose, to which the plaintiff replies that every year it goes into the next year with an overdraft, that the condition has been chronic. If the county operated on an overdraft for the entire two-thirds of the relief load not covered by the $23,000, it would go into the next year with such a deficit that even the next year's one-mill levy would not pay, and it would have no relief funds for that year or would have to heap deficit on deficit. There would come a time when it would be hopelessly in debt for relief and even reach its debt limit.

We do not believe that under the law limiting the county to a one-mill levy it was made the duty to pay all relief claims of those who take care of emergency cases, but only up to the point where the county may reasonably do so within its funds raised for that purpose. And there must be some discretion in the county commissioners. In this case they paid plaintiff in full for the hospitalization for the amputation of Palmer's toe, which was for the period between May 3d and May 19th. In some other cases the county paid in full, but in many other cases they paid only one-third of the hospital bill. The discrimination may have had a reasonable basis.

It is pointed out by plaintiff that section 19-16-27, R. S. 1933, provides that "the provisions of this chapter relating to budgeting shall not apply to appropriations necessitated by emergencies involving loss of life or property." We do not think this provision was meant to operate to exempt from the budgeted amount single cases of emergency. It was intended to take care of a catastrophy

which no budget could contemplate, such as major community calamities caused by floods, fires, explosion, hurricanes, cyclones, earthquakes, epidemics, etc.

It was found by the court that no emergency existed in this case. Defendant cites cases holding that emergencies include only those instances where loss of life must be inevitable unless the patient receives the most expeditious attention; that in all other cases the county must be notified and give its consent. *Dykes* v. *Stafford County,* 86 Kan. 697, 121 P. 1112; *Leinbach* v. *Board of Com'rs,* 116 Kan. 347, 226 P. 993; *Newcomer* v. *Jefferson Township,* 181 Ind. 1, 103 N. E. 843, Ann. Cas. 1916D, 181. We are inclined to the view that in a jurisdiction like ours, where there is a relaxation of the strict rule of nonliability for services rendered to a poor person without special authorization or consent of an official designated by statute to authorize the performance (see note, 93 A. L. R. 900), the rule that the necessity for attention must be most urgent should be enforced; otherwise, the door might be opened for unscrupulous people to file claims against the county for alleged indigents they purported to care for. But we do not want to be understood as saying that where, as in the instant case, the patient reasonably appeared in urgent need of attention and it was impossible to know what was his real condition, that attention given in such case without authorization may not be the basis of a good claim. In other words, the hospital in this case did not need to take the risk that if it was discovered that an apparently urgent need turned out after all to be one which might have waited or which was not in fact an emergency, then the claim would not be allowed. It is one of those many situations in life where the ingredient of common sense should govern the hospital, the county commissioners and the court. On the other hand, citizens who aid those needing relief must charge some of it to their good impulses and a fulfillment of their humanitarian spirit and not seek to recoup for all good

services. And we do not mean this observation to apply to Dr. Merrill, who seems to have done much along that line in not charging for medical or surgical services.

But in this case it appears that the leg was not amputated until two or three days after the patient's return to the hospital. In that time the hospital had opportunity to get in touch with the commissioners. The chain of events was as follows: Rumble, after trying various parties, finally contacted Mohr. Mohr gave orders to Roff, the fire chief, to get Palmer with the Cache county ambulance and deliver him to the plaintiff. This was done and plaintiff received Palmer. The hospital did not even know that Mohr had ordered Palmer back. The only connecting link between the county and the hospital was Mohr, and he had no express or implied authority according to the finding. Consequently, only for the care on account of an emergency can the hospital collect. On the theory above set out that not only where it is apparent that a patient will die unless cared for, but where the circumstances are such that it reasonably appears that there is urgent need of attention to save life, that is, where one is fully justified in resolving the doubt in favor of procuring the examination and care, this was an emergency case as far as determining what was wrong was concerned. For this service the county would be responsible without obtaining its authority. But after the patient was in the hospital and no operation was performed for two or three days, there should have been time to get in touch with the proper county authorities. In this case, all the hospital knew was that Palmer had been brought to them. They had previously released him. It is problematical as to whether the authorization to take off the toe would have included authorization without further arrangement to perform the major operation done after May 19th. But if so, it is not in this case. According to the pleadings, a duty on the county to pay arose from the emergency of the 19th of May. As appears by the evidence

the hospital assumed that it could collect only on the fact that the county had paid in full for the period between May 3d and May 19th, and on this based its assurance that pay would be forthcoming for the subsequent period. It could not base a claim on reliance on that fact. It can base a claim for hospitalization for the brief period it took care of the patient pending the time it could get authorization from the county to continue and if, during this period, it was necessary to amputate the leg, it could do that and could charge for such hospitalization. This is all on the theory that the county must respond for emergency care even though there is no authorization. But any one who gives relief in an emergency because the matter is too imminent to permit of the obtaining of authorization must at the first opportunity get in contact with those who are liable and obtain authorization for further care. If that is not given, he can only recoup for such services and care as are necessary to administer so as to put the party in a condition where he may be safely removed. He may obtain remuneration for such period. Having obtained the victim under an emergency, he does not have to relinquish him before it is safe to move him, even if the authorities fail to extend authorization. But he cannot recover beyond that period.

In this case plaintiff was remiss in not attempting to get in touch with the commissioners as soon as possible after Palmer came to it instead of placing reliance in a former action of such commissioners. If it had tried to do so and not succeeded and it became necessary to operate to save life, the hospital could recover for such hospitalization up to the point where the patient could be safely moved without authorization. Such would be all tied into the emergency. But in this case, it does not appear that the hospital attempted to make arrangements for the operation, although it was not performed for two or three days after Palmer's second admittance; nor does it appear that the hospital got in touch with the commissioners until

some time after the operation. There is some evidence that Merrill talked about it before he presented the hospital's bill on September 17th, but he made no inquiry as to what the county would do. He went on assuming.

On the other hand, the commissioners knew that Palmer was back in the hospital. They simply stated, "Well, He is there upon his own responsibility, because the hospital has not called us." It would perhaps have been the more decent thing for the commissioners, when they did not hear from the hospital, to get in touch with it. But not having authorized his hospitalization and not being liable on any other theory without authorization, except for the hospitalization actually necessary to take care of the emergency, the fact that the commissioners did nothing cannot alleviate the plaintiff's position. There is no estoppel where one party has not conducted himself so that another acts in reliance on his conduct. When one who has the duty to move, has not done so, he cannot excuse his failure on the theory that the other knew of his situation and therefore it was the other's duty to move. And he cannot transmute such failure on the part of the other to make the first move when he has the duty to move into an acquiescence by the other simply because that other knew of his situation. Or, to put it concretely, where a person assumes care of a county indigent in an emergency and has the duty to determine as soon as possible what those upon whom the liability for care on account of the emergency intend to do in regard to the situation after the emergency passes, he cannot build an estoppel or an acquiescence, an affirmance or a ratification, out of the fact that the county knew he was caring for the indigent and failed to approach him.

We have already stated that the pleadings were not based on the theory that the authorization for the second operation went back to the authorization of May 3d. But it is argued that payment in full for that period itself raises an estoppel because it was permissible for the hospital to

rely on that as an expectation for full payment. We have already touched on the question of the right to rely on that payment as an excuse for the failure of the doctor to seek a definite arrangement. In addition, it may be added that the evidence shows that Palmer himself came to the county commissioners and obtained their permission to go to the hospital to have his toe amputated; that the commissioners thought it would be a minor matter taking three or four days and for that reason paid the account in full. Mr. Chambers, one of the county commissioners, testified that before the hospital's bill was presented for the second period, even in view of their having paid the bill for the first operation in full, they did not expect to pay more than one-third of this bill for the second period. He testified that this was because in 90 per cent of the cases they only paid one-third and that in those cases it was by special arrangement made with the hospital or some other person usually before the patient was taken to the hospital; that they had no classification of emergency cases; that the rule to pay more than one-third did not necessarily depend upon the case being an emergency case but upon circumstances which they thought sufficient to relax the rule. He further testified that their agreement to pay one-third had been made in emergency cases involving life; that the arrangement was with persons approaching the commission and not with the hospital; that such persons then made their arrangements with the hospital and the county paid one-third the bill. It further appeared that at least once the county had paid only a third of the hospitalization of cases which were sent to plaintiff, but it did not appear that such arrangements had been made directly with the hospital. Therefore, there is no direct evidence that plaintiff knew of the one-third rule, although considering that it had been in force for more than a year and had been applied in cases going to plaintiff hospital and had been the rule in a great percentage of all cases, it is surprising that it was not known by a hospital which would naturally be interested in

such a rule and hear about it. At all events there was no authority for Mohr to commit Palmer, nor could the hospital charge for the period of care required by the emergency without authorization. It was the duty of the hospital to ascertain as soon as possible the attitude of the county as to the assumption of liability and its failure to do that was not excused by the knowledge of the county that Palmer was in the hospital. The county's nonaction may have been founded on its belief that the hospital knew and would accept its one-third rule.

We shall remit the case to the lower court with the following instructions: To take evidence on the question of whether the plaintiff had, after Palmer was returned, endeavored to get in touch with the county before the amputation of the leg. If so, and it had not succeeded, how long after the amputation it was necessary to keep Palmer before it would be safe to move him. If the hospitalization for such period is more than $192.50, plaintiff to obtain judgment for such additional and costs of this appeal; if not, the plaintiff is not to recover any additional and defendant shall be allowed its costs on this appeal. If the lower court finds that plaintiff failed to use reasonable efforts to contact the county commissioners before the amputation after Palmer returned, the judgment shall stand, and defendant shall have its costs on appeal. If the plaintiff fails to prosecute the case for the findings herein permitted within a reasonable time after remititure goes down, defendant may apply for a dismissal, in which case it shall have its costs on this appeal.

FOLLAND, C. J., and HANSON, MOFFAT, and LARSON, JJ., concur.