## WASHINGTON TOWNSHIP OF ALLEN CO. *v.* PARKVIEW MEMORIAL HOSPITAL.

[No. 1067A79. Filed April 10, 1969. Rehearing denied May 14, 1969. Transfer denied August 11, 1969. Petition for rehearing of denial of transfer denied October 24, 1969.]

*Norbert L. Wyss, Kenneth M. Waterman,* both of Fort Wayne, for appellant.

*Rothberg, Gallmeyer, Fruechtenicht & Logan,* of Fort Wayne, for appellee.

HOFFMAN, J.—This appeal arose from a judgment adverse to appellant, Washington Township of Allen County, Indi-

ana, defendant below. The action began with the filing of a complaint by appellee against appellant for payment for services rendered on behalf of Mrs. C. W. Hutchens, deceased, by appellee, Parkview Memorial Hospital, for her hospital care and treatment. Appellee sued on the basis of § 5 of the Acts of 1935, ch. 116, p. 432, as amended by Acts 1963, ch. 256, § 1, p. 389, § 52-148, Burns' 1964 Repl.[1], commonly known as the "Poor Relief Act", which provides, in pertinent part, as follows:

> "The overseer of the poor in each township shall have the oversight and care of all poor persons in his township so long as they remain a charge, and shall see that they are properly relieved and taken care of in the manner required by law. He shall, in cases of necessity, promptly provide medical and surgical attendance for all of the poor in his township who are not provided for in public institutions; and shall also see that such medicines and/or medical supplies and/or special diets and/or nursing as are prescribed by the physician or surgeon in attendance upon the poor are properly furnished."

The facts important to a determination of the issues in this cause are as follows:

Mrs. C. W. (Georgia) Hutchens and her husband, Cecil, were both industrious, but somewhat economically marginal. The Hutchens lived in Washington Township, Allen County, Indiana, since 1955. They were both in their late fifties. Mrs. Hutchens had not worked since 1951. In 1961, Mr. Hutchens was released from his employment with the Bowser Company (where he had worked for 11 years) when the company moved to Tennessee. There was no retirement provision for Mr. Hutchens and, thereafter, he took a series of odd jobs for various employers, rarely making more than $2 per hour. During the early part of this decade, Mrs. Hutchens began to suffer severely from a diabetic condition with various complications. By August of 1963, Mr. Hutchens was deeply

---

1. This Act was amended in 1967, but at all times pertinent hereto was as stated above.

in debt as a result of five successive hospitalizations of his wife and the consequent hospital and medical bills. He filed bankruptcy and was discharged in bankruptcy, but new debts quickly accumulated to take the place of the old ones. With income amounting to little more than $200 a month, Hutchens was faced with obligations for car payments, house payments, necessary drugs costing from $3 to $17 per week, insurance, taxes, heating bills, grocery bills and all the other budget requirements.[2]

Mrs. Hutchens, during this period, made an unfortunate effort to avoid seeing a doctor in order to minimize doctor and medical expenses. After some months, the obvious necessity of medical treatment forced Hutchens to take his wife to a doctor on August 26, 1963. The doctor immediately hospitalized her and began emergency treatment for a gangrenous condition of both legs and a part of the pelvic area. Mrs. Hutchens spent the remaining two years of her life in the hospital undergoing constant treatment. Both legs were amputated, and in her final illness an absess of the brain developed. Excluding doctors' bills, the entire hospital bill, chargeable to Hutchens, including room, drugs and other required expenditures amounted to $19,806.18. The hospital charged off $5,000 as charity, reducing the total to $14,806.18. For the first 70 days of Mrs. Hutchens' hospitalization a minimal amount of money was provided by insurance benefits where Mr. Hutchens was employed. Mr. Hutchens also voluntarily agreed to, and did, pay $6 per week out of his somewhat sporadic wages to the hospital up until the death of his wife.

After the insurance policy expired and when it became obvious to Mr. Hutchens that the hospital and medical bills were going to far exceed his income, he sought the assistance of his township trustee, having first been informed by

---

2. The record showed that Hutchens had no equity in either his house or his car.

the county welfare department that the trustee was the proper administrative agent for such a request. Mr. Hutchens went to the home of John R. Sunderland, township trustee for Washington Township, Allen County, Indiana. There he met with Mrs. Lucy Sunderland, the trustee's wife, who acted throughout as her husband's agent. Mrs. Sunderland treated him summarily. Upon finding he was "employed", and "buying his own home", she told him that unless he was "down and out", he was ineligible for assistance, and on further inquiry by Mr. Hutchens, Mrs. Sunderland told him it would be useless for him to return.

After Mrs. Hutchens' death, Mr. Lanning Baker, business manager of appellee, approached the trustee, through Mrs. Sunderland, concerning the Hutchens' account, and the possibility of the trustee paying it. Again, Mrs. Sunderland "told me [Mr. Baker] in no uncertain terms that she didn't think that the Township would help in any way at all."

Both litigants are essentially agreed on the issues involved in this case, namely: 1) Was Mrs. Hutchens a "poor person" within the meaning of the statute, thus entitling her to the care and attendance of the township trustee under the provisions of § 52-148, *supra*; and 2) was the notice or application given to the trustee such that a duty to investigate the conditions and circumstances of the alleged "poor person" would devolve upon him?

The trial court by its decision found Mrs. Hutchens was a "poor person" and that effective notice had been communicated to the trustee, and awarded a verdict to appellee in the amount of the account outstanding.

Appellant then filed a motion for new trial which was overruled, and this appeal followed.

Appellant presents the question to us with two specifications of error: 1) that the decision of the court is not sustained by sufficient evidence; and 2) that the decision of the court is contrary to law.

In addition to the two issues here raised, a more basic consideration and determination is necessary. It must be decided what the duty of the township trustee is with respect to "poor persons", and at what point that duty arises under the statute. Appellant argues that the trustee is under no obligation unless he agrees to pay prior to the time the patient enters the hospital, or medical aid is administered. Appellant further argues that the only exception to this requirement is the emergency exception, where an "indigent" requires immediate aid and attendance. We find no relation between the "emergency" exception and this case.

Based upon the statutory prerequisite of "necessity", appellant argues that no *necessity* was shown in this case since the services had already been rendered at the time the trustee was advised of the situation. Such a distinction is superficial. Necessity for treatment was certainly shown and that is the central concern. The following uncontradicted testimony, on direct examination, of Dr. Richard B. Juergens, the decedent's physician, is of probative value here:

"Q Would you describe, please, for the Court here her condition when you saw her on August 26, 1963?

"A She was complaining mainly of paralysis of the right leg with some swelling and some discoloration. She had some redness in both of her inguinal regions or in the groin, and there was gangrene formation in the left inguinal region, also involving a small portion of the external genitalia, or the vulva. She was speaking, cooperative, coherent. She was having some discomfort from the swelling in the areas of inflammation and gangrene.

"Q What did you think ought to be done with her?

"A She needed to be hospitalized.

"Q Will you tell the Court whether or not you thought that hospitalization ought to take place immediately or could be taken care of some other time?

"A No, it needed to be immediate.

"Q How urgent was it?

"A I would say if it wasn't properly taken care of and taken care of promptly it would be a life and death matter."

This testimony is adequate evidence of the *necessity* for prompt medical and surgical care. The fact that Mrs. Hutchens was already being cared for when the trustee was informed of the situation furnished no excuse for non-performance of the duty on the part of the township trustee to care for her upon a determination of her status as a "poor person." *The Board of Commissioners of Tipton County v. Brown,* 4 Ind. App. 288, 290, 30 N. E. 925 (1892).

For purposes of our next consideration, we refer to *Parkview Hosp. v. County Dept. Pub. Welf.,* 134 Ind. App. 689, at page 695, 191 N. E. 2d 116 (1963), where Judge Pfaff, speaking for this court, held that the terms "indigent person" and "poor person" are synonymous, and elaborated on a definition with respect to the Poor Relief Act, Acts 1935, ch. 116, § 33, p. 432, § 52-176, Burns' 1964 Repl., as follows:

"[W]e do not understand the legislative intent to be that in order for a person to be an 'indigent person' within the meaning thereof there must be a complete lack of resources. Rather, we believe the legislative intent was to include those persons who did not have resources sufficient to pay for all the medical and hospital services required by the injury."

The Legislature has provided a definition of the term, "indigent person", Acts 1965, ch. 172, § 1, p. 302, § 52-1146, Burns' 1968 Cum. Supp., which reads in pertinent part:

"For the purpose of this act the term 'indigent person' shall mean a person without financial resources to pay for such medical or hospital care."

Applied to the situation at hand, the Hutchens were "poor persons" within the purview of the statute at the time of Mr. Hutchens' visit to the home of the township trustee. The

unfortunate fact is that Mr. Hutchens, like many Americans today, was making an honest effort, in good faith, to make ends meet. At the age of 59 he suddenly was left without a job and with no particular skill or trade to qualify him for further employment. At the same time, his wife became seriously ill with diabetes and complications. Still, Mr. Hutchens made every effort to preserve a financial balance. However, his financial liabilities far outweighed his income. Not until the obvious became apparent to him did Mr. Hutchens seek the aid of the "overseer of the poor."

Considering the evidence most favorable to the appellee, Mr. Hutchens and his wife were "poor persons" by any subjective or objective test, and thus, the specification of error on sufficiency is answered—there was no error, and there was a sufficiency of evidence.

Finally, the legal effect of the notice, or lack of notice, to the township trustee must be considered.

The duty of the trustee to provide medical and hospital care for poor persons is mandatory. There is no room for discretion once the determination is made. Section 52-148, *supra*. No such determination was ever made in this case. On direct examination Mr. Hutchens testified as follows:

"Q Did you see Mr. Sunderland, or where did you go to see him?

"A I was out to Mr. Sunderland's house.

"Q Who was present?

"A Mr. Sunderland wasn't there. I talked to his wife and she seemed to be running the business.

"Q Did she act as though she had authority to act on behalf of the Township Trustee?

"A Yes, she did.

"Q And what did she say to you and what did you say to her?

"A   Well, I asked her if I could get any assistance at all, and she said no, not if I was working. She said you couldn't have a job, you had to be down and out to get any assistance from the Trustee.

"Q   Did you explain to her these facts and all these details?

"A   Yes, I explained to her all right.

"Q   Did you tell her it looked like **Mrs.** Hutchens would be there until she passed on?

"A   Yes.

"Q   Did you tell her everything you knew at that time?

"A   Yes. She barely sympathized with me.

"Q   Did she ask you to come back?

"A   No.

"Q   Tell you to sign or file a form?

"A   No."

On cross-examination, Mr. Hutchens testified:

"Q   After this visit, did you ever go back to the Washington Township Trustee's office?

"A   No, she told me it wouldn't do any good to come back.

"Q   So you never went back?

"A   No."

Three things are apparent from this testimony: 1) the township trustee had actual notice of the situation; 2) Mr. Hutchens was not informed of the need to file an application, nor was a form of application offered to him by Mrs. Sunderland; and 3) the township trustee, through his agent, chose not to investigate beyond the brief inquiry made by his wife.

The trial court properly found that effective notice was given to the trustee. We emphasize the more substantive consideration; namely, the duty of the trustee to provide for poor persons within his jurisdiction. A prior authorization by the trustee is not a prerequisite to

imposition of responsibility under the statute (§ 52-148, *supra*) on the township for care of "poor persons." The duty exists *absque ulla conditione*. The conditional proviso within the Act is not the duty to provide treatment and care to "poor persons" in cases of necessity, (this is mandatory) but the determination, by the trustee, of one's status as a "poor person." This question must be answered, according to the standards supplied by the Legislature and the courts, at whatever time it is presented to the trustee. At that point the duty to investigate and determine the status of an alleged poor person arises. The question is *not*, whether prior authorization was obtained. We take notice of the fact that in these times, the trustee is often unknown in his own township. It would be too easy for him to simply refuse aid and attendance because of some technical error; but the Legislature intended for this Act to have a more substantial effect. *Parkview Hosp. v. County Dept. Pub. Welf., supra.* To say, as appellant suggests, that it should be relieved of responsibility simply because strict compliance with the formal application requirements was not followed is to disregard the manifest purpose of the Act. (§ 52-176, *supra*.)

It follows from this discussion that the decision of the trial court was based on sufficient evidence and was not contrary to law.

Finding no reversible error, the judgment of the trial court must be affirmed.

Judgment affirmed. Costs taxed against appellant.

Pfaff, C.J. and Sharp, J., concur; White, J., dissents with opinion.

### DISSENTING OPINION

WHITE, J.—One Georgia Hutchens, wife of Cecil W. Hutchens, was a patient in appellee hospital continuously from her admission on August 26, 1963, until her death on September 27, 1965, a period of some twenty-five months.

Alleging Mrs. Hutchens was an indigent, appellee hospital, after her death, brought this action to recover from appellant township the balance of the patient's hospital account which remained unpaid after insurance benefits, payments by the husband, payments by the County Welfare Department, and a charity write-off had been credited. Upon the issues formed by the complaint and a one paragraph answer pursuant to Supreme Court Rule 1-3, a trial without jury resulted in a judgment against appellant in the sum of $14,806.18. From the overruling of its motion for new trial on the separately stated grounds that the decision is not sustained by sufficient evidence and is contrary to law, appellant has perfected this appeal.

The facts most favorable to the appellee are these:

On August 26, 1963, Cecil W. Hutchens, age 55, the patient's husband, a resident for several years of Washington Township of Allen County, Indiana (the appellant township), was a factory worker whose total 1963 earnings were $4,474.41. He was buying on contract a house in which he had little or no equity. He had an old model automobile in which his equity was likewise of doubtful value. He did, however, have group hospitalization insurance covering his wife, Georgia, who was hospitalized that day in the appellee hospital at the direction of a physician to whose office Mr. Hutchens had taken her. The insurance paid $16.00 per day for the first seventy days plus some other expenses that eventually amounted to a total of $1,352.00 paid by insurance. Mrs. Hutchens remained in the hospital continuously from August 26, 1963, to the date of her death on September 27, 1965, a period of twenty-five months. In addition to the insurance payment, Mr. Hutchens paid appellee hospital six dollars per week during a part of the time his wife was in the hospital. The total paid by him is not stated in the briefs, but apparently was quite small. On August 20 or 21, 1964, the appellee hospital's business manager wrote-off $5,000.00 of the bill as charity. And from July 1, 1965, on to the end,

the hospital cost was paid by the Allen County Department of Public Welfare. There nevertheless remained an unpaid balance of $14,806.18, for which the trial court's judgment held the appellant township liable.

The only direct evidence of any notice to the township trustee, or of any request to the trustee to authorize the hospital care, is found in the testimony of the patient's husband, in the testimony of the business manager of appellee hospital, a Mr. Baker, and in the testimony of the trustee's wife, Mrs. Sunderland. The notices or requests were all orally conveyed to Mrs. Sunderland[1] and their content is but vaguely disclosed. The first notice was given by the patient's husband to the trustee's wife when he came to her house at a time which he testified he thought was shortly after the seventy days of insurance benefits had been exhausted. This would have been shortly after November 4, 1963, admission having been on August 26, 1963. However, Mrs. Sunderland testified the visit was made on September 23, 1963. A welfare worker also testified Mr. Hutchens came to the welfare office September 20, 1963, and was told to see the trustee. He returned on September 26, 1963, saying the trustee had refused relief. But in light of the rule of law I find to be applicable, it is more favorable to appellee to find that notice was given to the trustee shortly after the insurance benefits had been used up and the patient had thus become an indigent. Therefore, I would assume the trial court found that shortly after the insurance expired, Mr. Hutchens "notified" the trustee of these facts: Mrs. Hutchens was in the hospital, and had been there over seventy days. It looked to him like she would be there until she passed on and his insurance benefit period had run out. He was working but he could not pay the bill. He asked for help from the trustee. Mrs. Sunderland told him he could not get any assistance because he was working;

---

1. There was evidence, admitted without objection, from which the trial court could have found that Mrs. Sunderland was the agent or deputy of the trustee (her husband) with respect to all matters pertaining to poor relief.

that a person had to be down and out to get relief. Mr. Hutchens had no other contact with the trustee or with the trustee's wife.

The next contact was made by telephone. Mr. Baker, the appellee hospital's business manager, telephoned Mrs. Sunderland some four or five months after Mrs. Hutchens had been admitted. He asked if Mr. Hutchens had contacted Mrs. Sunderland earlier and was told that he had. The only thing Mr. Baker testified to having told Mrs. Sunderland at that time was that it "looked like it was going to be a real tough situation." What else he may have told her in that conversation or on two or three other occasions when he called her is not disclosed. He asked her if the township was going to render assistance. She told him in no uncertain terms that she didn't think the township would help in any way. This is the evidence, and all the evidence most favorable to appellee, with respect to what notice anyone gave to the trustee in connection with Mrs. Hutchen's hospitalization.[2]

The evidence with respect to whether the hospitalization was necessary and whether an emergency was involved consisted almost entirely of the attending physician's (Dr. R. B. Juergens) testimony. He stated that when he first saw her on August 26, 1963, she needed immediate hospitalization, the prompt provision of which was a matter of life or death.

---

2. A large part of the trustee's wife's testimony with respect to her conversations with Mr. Hutchens and Mr. Baker is at variance with their testimony. Especially is that so with regard to the dates of the conversations and the number of calls from Mr. Baker to Mrs. Sunderland regarding the Hutchens' case. Such conflicting testimony must, of course, be disregarded when reciting the evidence most favorable to appellee. One statement by Mrs. Sunderland as to what Mr. Baker said was never denied by him and is not in conflict with anything which he said in his testimony. In fact it is compatible with his testimony that on August 20 or 21, 1964, $5,000 of the Hutchens' bill was charged off as charity. Mrs. Sunderland testified that Mr. Baker had made the statement that appellee had taken Mrs. Hutchens in as a charity patient to start with. The trial court could have, nevertheless, disbelieved such testimony because it was inconsistant with the information on the admission certificate and because of the other conflicts between her testimony and Mr. Baker's. I, therefore, disregard it.

There was further testimony of her continued need for hospitalization thereafter, but no evidence of how long such necessity continued to be a matter of life or death. Nor was there any evidence that at any particular time thereafter she could not safely have been moved. A debridement (an operation in which dead tissue resulting from gangrene was removed from the inguinal region) was performed at an unspecified time during the first month of her confinement. Approximately a month after admission both legs were amputated. Although the doctor did not testify that Mrs. Hutchens could not have been moved at some time during that month, we shall assume, *arguendo*, that the trial court could have so inferred and that an inference that the emergency continued through some reasonable post-operative recovery period could also be drawn. But there is no evidence from which the trial court could have found that anything approaching a life and death emergency requiring continued hospitalization was reasonably to be anticipated at any time during the first seventy days of hospitalization. An inference that she could not have been safely moved after a short period of recuperation following the double amputation likewise finds no support in the evidence.

Consideration was given at some time (probably after the first seventy days) to moving her to a nursing home but her doctor advised against it because nursing home care was "inadequate". No statement was made that she could not safely have been moved. In fact, she was eventually committed to the Richmond State Hospital and would soon have been moved there had she not died in an episode of aspiration of vomitus, which was apparently an unanticipated, if not accidental, event.

The husband continued to be employed up through the time of trial and at sometime during the hospitalization agreed to and did pay six dollars per week to the hospital. What total amount he paid is not set out in the briefs, but he discontinued payments after his wife's death. We are satisfied,

however, that after the insurance benefits were all used up that Mr. and Mrs. Hutchens could have qualified as poor persons for the purpose of receiving continued hospitalization at township expense through trustee authorization. As to food, clothing, shelter, and transportation, they were not poor persons because Mr. Hutchen's wages were sufficient to provide the minimum requirements in these categories on a cash basis. But if no one was willing to furnish him, on credit or as a gift, the continued hospitalization which Mrs. Hutchens needed, he could not have bought it for cash.

However, at the time of admission, with the insurance benefits then available, their situation was quite different. It would have been unrealistic to have assumed that the insurance would pay all hospital costs for the first seventy days, but it would have been reasonable to assume that the husband, with the aid of the insurance, could have paid for such a period of hospitalization. This is not to say, of course, that he could have paid cash in advance or daily or weekly as the charges accrued. But on an installment plan, spreading payments over a reasonable period in the future, there is no reason to assume that he could not have paid what the insurance did not pay for during a hospital confinement of only seventy days.

The parties have differed in their briefs as to what constitutes an accurate statement of the issues. Both, however, have made their written arguments on the same three points, each wording its statement of the point to express its version of the law. I believe a fair statement of a neutral version of these points (which were argued as issues) would be:

1. Was there sufficient evidence from which the trial court could have found that the patient (Mrs. Hutchens) was a poor person within the meaning of Ind. Acts 1935, Ch.

116, § 5, as amended, being also Ind. Ann. Stat. § 52-148³ (Burns 1964).

2. Can, as a matter of law, a township ever be required to pay a poor person's "past" indebtedness for major hospital bills?

3. Was a proper and timely application made to the township trustee and is the township liable without the trustee's authorization if he has been given reasonable notice?

The parties were in agreement at oral argument that the trustee did not authorize the rendition of the hospital service in question at township expense, nor does appellee's brief contend that there was any evidence of such authorization. This, of course, is tantamount to agreeing that if proof of such authorization was an essential element of appellee's case below, the decision of the trial court was not sustained by sufficient evidence and should be reversed. For the reasons hereinafter stated, I would hold that, on the facts of this particular case, proof of authorization was essential. I therefore, would reverse.

Appellant relies on *Morgan County v. Seaton*, 122 Ind. 521, 24 N. E. 213 (1890), and *Sherfey and Kidd Company v. Board of Commissioners*, 26 Ind. App. 66, 59 N. E. 186 (1901), both of which were decided prior to the enactment of either the 1901 Poor Relief Act or the 1935 Poor Relief Act. These cases declare, without exception, that relief furnished poor persons without prior authorization by the proper officer is not a municipal obligation. Appellant also recognizes that later cases decided under the 1901 Act, and under the 1935 Act, have recognized an exception to the strict rule

---

3. All services were rendered prior to the amendment by Ind. Acts 1967, Ch. 251, § 1, which is the version of Burns § 52-148 found in the 1968 Cumulative Pocket Supplement. However, neither the 1967 amendment nor any of the previous amendments has altered the first paragraph of the section since its 1935 enactment and it is the only part of the section here involved.

of those earlier cases. Appellant contends that the only exception to non-liability in the absence of prior authorization, is liability for care furnished in an emergency requiring immediate attention before it is feasible to communicate with the overseer of the poor. Appellant also contends that liability continues only during the emergency which he contends must necessarily be of short duration. Appellant also contends that Mrs. Hutchens was not a poor person.

Appellee, on the other hand, contends that Mrs. Hutchens was a poor person and that emergency hospitalization coupled with reasonable notice to the township trustee creates liability as long as the hospitalization continues.

The first reported Indiana case which recognizes an exception to the general rule of non-liability of township for medical services rendered to a poor person without prior authorization from the overseer of the poor is *Newcomer v. Jefferson Township*, 181 Ind. 1, 103 N. E. 843 (1914). That case held then the township was liable, under the 1901 Poor Relief Act, for surgical services rendered to a poor person's son, who was so severely injured by a train that he would have died had the surgeons delayed attention long enough to communicate with the trustee before operating. After reciting the facts, the opinion states (181 Ind. at 4):

> "It may be conceded as a general rule that a claim against a county or township, can only be founded upon a contract with the proper officer under authority of a statute, acting within the scope of his statutory authority, or upon a statute."

After reviewing changes made by the enactment of the 1901 Poor Relief Act (since replaced by the 1935 Poor Relief Act) the opinion continues:

> "By § 9746, *supra*, [Burns IND. STAT. ANN., 1908] the overseer is given oversight of the poor of his township, and required to see that they are properly relieved and taken care of in the manner provided by law, and elsewhere in the act it is pointed out what he shall do. It then pro-

vides for cases of necessity, and for prompt provision of medical and surgical attendance and medicines for all poor in his township, outside of public institutions. Now suppose that no one but the trustee is authorized to act, and he is absent, or cannot be found, and death is imminent, unless aid is given. Shall the person be permitted to die, because the overseer cannot be found? Or, suppose he is found, and for reasons of his own, or because he thinks it unnecessary, refuses to employ aid, is it enough to say that the law will be satisfied by prosecuting him criminally for failure to discharge a plain statutory duty, even though a human life is sacrificed? The services of a surgeon or physician cannot be required as a matter of charity, and in the meantime death ensues. It is probably different where there is an opportunity, by reason of conditions, to communicate with the overseer, or where he can have an opportunity to examine into the conditions; there he should be called on. But suppose in an emergency he refuses for any cause, to act, or cannot be reached. The law is just as mandatory that the relief shall be given at the expense of the township, as it is that the overseer shall provide it. It is therefore the law's mandate in such an emergency as is here shown which raises an implied liability to one who renders such necessary and prompt services as is here shown, for the reasonable value of the service. It is not a voluntary service, but an obligation imposed by law. *Board, etc., v. Cole* (1893), 9 Ind. App. 474, 36 N. E. 912. It may also be granted that the obligation does not arise upon the request of some one other than the overseer, but it is imposed by the statute, where the circumstances are such as disclose the necessity for prompt action by those who are capable of judging of the necessity and impending peril."

The following review of the subsequent Indiana cases involving medical or hospital care rendered indigents in emergencies reveals that the general rule stated above is still the general rule with regard to township liability. These are the only cases in which a township has been held liable for hospital or medical care rendered without a contract with (i.e. prior authorization from) the township trustee. The facts in these cases demonstrate that the emergency exception, as that exception is stated and delineated in *Newcomer, supra,* is still the only Indiana exception to the general rule.

*Portage Twp. of St. Joseph Co. v. Clinic, Inc.*, 109 Ind. App. 365, 33 N. E. 2d 786 (1941), involved the question of which, if any, of three townships was liable for medical and hospital services rendered to the minor daughter of a father already receiving poor relief. The girl was injured in an automobile accident in Springfield Township and taken immediately by ambulance to Michigan Township for hospitalization. Her legal settlement, however, was in Portage Township, where her family was on relief. The services were rendered during a period of a few days immediately following the accident and until the trustee of Portage Township was notified and removed the patient to a hospital in Portage Township where he furnished the care thereafter necessary. The removal appears to have been made as soon as the patient safely could be moved, but the exact number of days of care in the first hospital (the only period of care in question) is not stated.

That opinion is concerned only with the question of the liability of the township in which the girl was injured and the general statements of law in the opinion must be so read and understood. After a review and extensive quotation of various sections of the 1935 Poor Relief Act, the opinion reached two conclusions, which are the essence of the decision (from 109 Ind. App. at 373-4):

> "From a consideration of these sections of the act, it is clear that regardless of the established residence of such poor persons contemplated therein, such relief shall be administered by the overseer of the poor in any township wherein he may be found in need or distress.

> . . . . .

> "While it is true the act contemplates that the overseer of the poor shall direct and order the care given before liability accrues, yet the act certainly does not contemplate that unfortunates shall be left to suffer or die until such overseer of the poor can be found. In the case of *Newcomer v. Jefferson Township* (1914), 181 Ind. 1, 5, 103 N. E. 843, the court said . . . [here follows a condensed version of the

emergency exception we have already quoted more fully *supra*.]

"We are of the opinion that at the time the injury occurred in Springfield Township, the liability of such township was created, and that there was a necessity for prompt action existing for the removal of Louise Dombrosz from Springfield Township, and that such action did not relieve Springfield Township from liability under the statute, and that such liability continued after the removal of said Louise Dombrosz to Michigan Township.

"When this injury occurred to Louise Dombrosz in Springfield Township, then the obligation was imposed under the law upon Springfield Township; and due diligence was contemplated on the part of the overseer of the poor in such township. Louise Dombrosz, by necessity of prompt action, was removed to Michigan Township under a contemplated supervision of the overseer of the poor of Springfield Township, the same as though she had been removed to a hospital in Springfield Township, and such responsibility continued to exist upon the overseer of the poor of Springfield Township; and it was his duty to return said Louise Dombrosz to Springfield Township for further attention, or to return her to the township of her legal settlement for attention as provided by section 13; and until such action was had, Springfield Township was liable for all expenses incurred."

So far as *Portage* concerns the liability of a township for services rendered an indigent without the township trustee's prior authorization, it adds nothing to *Newcomer*. It merely affirms *Newcomer's* continued applicability notwithstanding the intervening adoption of a new Poor Relief Act, the 1935 Act, under which poor relief is still administered.[4]

---

4. It should be noted that § 5A (Burns § 52-148a), added in 1957, substituted county liability for township liability in the case of "any indigent . . . injured or . . . any indigent . . . non-resident of this state [who] becomes ill". It was under this § 5A that *Parkview Hospital, Inc. v. County Dept. of Pub. Welfare of DeKalb County*, 184 Ind. App. 689, 191 N. E. 2d 116 (1963), was decided. (The *Parkview* case is referred to *infra* in note 6.) § 5A was in turn repealed by Acts 1965, ch. 172, § 6. §§ 1-5 of that 1965 Act (Burns §§ 52-1146-50) substituted provisions placing the entire responsibility on the hospital or attending physician, the county department of public welfare, and the state department of public welfare, and leaving the trustee out entirely "in the event

Whether *Couger v. Millis,* 114 Ind. App. 336, 50 N. E. 2d 924 (1943), is an "exception" case, is open to question. The facts are, however, that a physician recovered for care to an indigent patient during 137 days of continuous hospitalization.[5] The trustee was notified immediately after the accident but there is no mention of whether he authorized, refused to authorize, or failed to act. Nor is there any indication that any contention was made that authorization was necessary or that non-authorization was a defense.

*Cougar* appears to have been litigated solely to settle the question of *which* of two townships was liable, not *whether any* township was liable.

Union Township was held liable for the treatment rendered in that township because of the indigent patient's legal settlement there. This was so, notwithstanding the fact he was injured in Wayne Township and he was removed to Union Township, not by the trustee, but by his brother.

*Couger* does make the general statement that "[i]t has been held frequently in cases involving emergency poor relief that the law is just as mandatory that the relief be given as it is that the overseer shall provide it." This statement is lifted out of context from *Newcomer v. Jefferson Twp., supra* 181 Ind. at 5. The context is made clear by quoting the sentences which, in *Newcomer,* surrounded that statement.

---

any indigent person is injured or in the event any indigent person who is a non-resident of the state becomes ill in any county of the state". This 1965 act prescribes a definite procedure for fixing responsibility on the proper county in such cases. By omitting from its coverage state residents who become ill (not by injury) the legislature must have assumed that few emergency cases fell into that category and that the trustees under the Poor Relief Act and county departments of public welfare under Chapter 300 of the Acts of 1947 (Burns §§ 52-1131 through 52-1133) should continue to handle these cases under the existing rules already developed by court decision.

5. The complaint alleged he could not be removed earlier and the undisputed evidence was that his condition was "critical" all of that time.

"But suppose in an emergency he [the township trustee] refuses for any cause, to act, or cannot be reached. *The law is just as mandatory that the relief shall be given at the expense of the township, as it is that the overseer shall provide it.* It is therefore *the law's mandate in such an emergency as is here shown,* which raises an implied liability to one who renders such necessary and prompt service as is here shown, for the reasonable value of the service. It is not a voluntary service, but an obligation imposed by law." (Emphasis added.)

The statement repeated in *Couger* out of context from *Newcomer* was made in connection with the rejection of the defense that the patient was removed from the township of the accident (where there was no hospital) to a hospital which happened to be in the township of the patient's legal settlement by a person other than the trustee of the township in which the injury occurred. We believe its application should be limited to that question and that *Couger* is no authority at all on the question of whether authorization by the trustee is necessary to create liability in any case.

The latest reported case which has some false appearance of being an exception to the general rule on non-liability without prior authorization is *Trustees of Indiana University v. Montgomery Township et al.,* 136 Ind. App. 4, 197 N. E. 2d 306 (1964). It involved two periods of hospitalization (July 23, 1959, to July 31, 1959, and August 14, 1959, to September ——, 1959) at Robert Long Hospital in Center Township of Marion County. The patient, whose indigency was not in question, was a short-time resident of Montgomery Township of Owen County, and immediately prior thereto had been a resident of Chicago. That he had acquired a legal settlement in Center Township of Marion County immediately prior to his nine-months of residence in Chicago was not known at the time of his hospitalization. (Whether this want of knowledge resulted from ignorance of the facts or of the law is not clear.) As a consequence, when the indigent was sent to Long Hospital by the trustee of Montgomery Township the trustee of Center Township

was not notified. After reciting the facts and the law, the opinion reaches these conclusions (136 Ind. App. at 11):

"While it was the duty, under our statutes and decisions, for the trustee of Montgomery Township, Owen County, to provide to the indigent necessary care and to pay for the same, it appears that the said trustee fulfilled his duty when he sent the indigent to the place of his legal settlement, to-wit: Center Township, Marion County, Indiana. *Couger, Township Trustee et al. v. Millis* (1943), 114 Ind. App. 336, 50 N. E. 2d 924. *Portage Township of St. Joseph County v. Clinic, Inc. et al.* (1941), 109 Ind. App. 365, 33 N. E. 2d 786.

"While it may be assumed that if the trustee of Center Township had obtained timely knowledge of the necessity for emergency hospitalization of the indigent, he would have sent the said indigent to the tax-supported institution in Marion County; yet said township is not relieved of the responsibility to pay the account to appellants under the facts and circumstances in this particular case, since, under these facts, we do not assume that appellant acted as a mere volunteer in providing the necessary emergency hospitalization and treatment to the said indigent person. To hold otherwise would not be in harmony with our Indiana statutes and decisions relative thereto. If hospitals were to reject admission in emergency cases until the legal settlement is established, or until one who is responsible and accepts the obligation for the care, hospitalization and treatment of such indigent, much harm could result."

The specific reason why the appellant hospital was not a volunteer "under the facts and circumstances of this particular case" is not expressly stated, but it is quite apparent that although the hospital was not authorized by Center Township's trustee to render the services at Center Township's expense, *it was authorized by the trustee of Montgomery Township,* the trustee who had the primary duty "to provide the indigent necessary care and to pay for the same". And if it had eventually been determined that the indigent had no legal settlement in any township in Indiana, Montgomery Township would have been liable. *Couger v. Millis, supra.*

We then have as precedent only two cases (*Newcomer* and *Portage Township*) in which the decision rests squarely on the proposition that the trustee's authorization is not essential to the creation of a township's liability for medical services rendered to a poor person in an emergency. What those cases hold is reaffirmed, but not expanded, by the *dicta* in the other cases above reviewed.

In 1937 the Supreme Court of Utah expressly followed Indiana's *Newcomer v. Jefferson Twp., supra,* (181 Ind. 1) and did what Indiana has not heretofore had occasion to do. It spelled out the limits of the emergency exception when the hospitalization continues over a period of time without authorization. In *Cache Valley General Hospital v. Cache County,* 92 Utah 279, 67 P. 2d 639, 643 (1937), that court said:

> "[A]ny one who gives relief in an emergency because the matter is too imminent to permit of the obtaining of authorization, must at the first opportunity get in contact with those who are liable and obtain authorization for further care. If that is not given, he can only recoup for such services and care as are necessary to administer so as to put the party in a condition where he may be safely removed. He may obtain remuneration for such period. Having obtained the victim under an emergency, he does not have to relinquish him before it is safe to move him, even if the authorities fail to extend authorization. But he cannot recover beyond that period."

The foregoing is clearly consistent with Indiana law as enunciated in the cases we have heretofore reviewed.

Measured by this rule there is no evidence in the record to sustain a finding that any of the hospital service furnished in the case at bar (and not already paid for by insurance, the patient's husband, and the charity write-off) were furnished under circumstances entitling the appellee to recover from the appellant.

While I am convinced that there is sufficient evidence in the record to sustain the implied finding of the trial court

that the patient here involved (Mrs. Hutchens) was a poor person during most of her period of hospitalization, yet the record is devoid of evidence to sustain a finding that she was a poor person at the time of her admission. Her husband was employed and, subsequently demonstrated an ability to pay six dollars per week. In addition thereto, he had employment connected insurance which paid sixteen dollars per day for the first seventy days of hospitalization plus other benefits.[6]

After Mrs. Hutchens became an indigent, Mr. Hutchens made an oral attempt to secure poor relief. Whether the trustee, on the basis of what he then learned, should have taken some action is not, in my opinion, an issue in the case. Appellee, however, argues that the trustee had a duty to investigate and take care of Mrs. Hutchens because she was an indigent.

But the evidence is uncontroverted that Mrs. Hutchens was being taken care of. In fact, all the evidence indicates that she at all times after admission to appellee hospital received the best care possible. And there is no evidence at all that Mr. Hutchens told the trustee (or his agent-wife) that the hospital was looking to the township to pay the bill. Or even that Mrs. Hutchens was in danger of being expelled from the hospital if Mr. Hutchens did not pay. Whether the

---

6. *Parkview, etc. v. County Dept., etc.*, 134 Ind. App. 689, 191 N. E. 2d 116 (1963), held that a person who "had an insurance policy which was sufficient to cover part of the required hospital and medical services" was nevertheless an "Indigent Person"; that it was not necessary "in order for a person to be an indigent person . . . [that] there must be complete lack of resources" but merely want of "resources sufficient to pay for all the medical and hospital services required by the injury." Necessity for prior authorization was not an issue in that case. Nothing is there said about the probable length of hospitalization foreseeable at the time the hospitalization commenced nor whether the insurance benefits paid only a part of the cost from the very beginning of the hospitalization. That case furnishes no basis for finding Mrs. Hutchens, the patient in the case at bar, to have been an indigent at the time of her admission to appellee hospital.

hospital and the doctors were providing charity to Mrs. Hutchens or extending credit to Mr. Hutchens beyond his capacity to repay is immaterial. The fact remains that Mrs. Hutchens was being well cared for. She never remained in need because her needs were being satisfied as they arose. The trustee's actions or inactions did not leave Mrs. Hutchens to suffer unattended.

It is certainly the moral duty of a township trustee to investigate whenever he receives word that an ill person in his township needs hospital care but is not receiving it because he or she cannot pay for it. If that moral duty is not also his legal duty I have no hesitation in going on record as saying that it *should be* his legal duty.

The majority opinion cites *Board of Commissioners of Tipton County v. Brown,* 4 Ind. App. 288, 290, 30 N. E. 925 (1892), as authority for the statement: "The fact that Mrs. Hutchens was already being cared for when the trustee was informed of the situation, furnished no excuse of the duty to care for her upon a determination of her status as a 'poor person' ".

What that case actually said and held, in this regard, is found beginning on page 290 of 4 Ind. App.:

"The appellee and his wife testify that the trustee asked them if Charles could be moved; that they told him he could not be; that the trustee then told them to continue to care for Charles the best they could, and the county would pay appellee for it.

"It thus appears that there was evidence from which the jury had a right to conclude that there was an arrangement between the appellee and the trustee by which the latter directed the former to care and provide for Charles Brown at the expense of the county. It is the duty of the township trustee, who is the overseer of the poor, to have the oversight and care of all poor persons in his township who are a permanent charge. Section 6071, R. S. 1881. It is also the duty of such trustee to grant temporary relief to poor persons who have no permanent settlement, or when the same can not be ascertained, or to the transient poor.

Sections 6077 and 6078, R. S. 1881. *The nature and extent of such relief are necessarily left to a large extent within the sound discretion of the trustee. Board, etc. v. Harlem,* 108 Ind. 164. *The fact that the poor person is already being cared for when the trustee is informed of the case furnishes no reason for a failure on the part of the trustee to make arrangements for future relief if he regards such as necessary. Board, etc. v. Jennings,* 104 Ind. 108." (Emphasis added.)

It was also argued in that case that the appellee should not be paid for taking care of his indigent brother because of their family relationship. But the court said:

"It should be left to the jury, under all the facts and circumstances of the case, to determine whether the services were to be gratuitous or the county was to be looked to for compensation, and *when there is positive proof of a contract* with the township trustee that the pauper was to be cared for at the county expense, and the contract was within the powers of such trustee, this would be conclusive evidence to overcome any presumption arising from kinship and the like.

"We think the evidence tends to support the verdict." (Emphasis added.)

Whatever that case may have held to be the trustee's duty when informed that a poor person is ill but is already being cared for,[7] it most certainly did not hold that a trustee's failure to authorize future care made the county liable for care furnished by a volunteer.

Neither that case nor the case at bar raises the question of what duties a township trustee, as overseer of the poor, owes to the poor. The question here is what duty he owes to a hospital which he learns is furnishing care to the wife of an employed man who is not receiving poor relief, (and

---

7. What the court said was: "The fact that the poor person is already being cared for when the trustee is informed of the case furnishes no reason for a failure on the part of the trustee to make arrangements for future relief *if he regards such as necessary.*" (4 Ind. App. at 290. (Emphasis added.)

there is no evidence she or her husband ever did receive poor relief). This is made clear by the appellee's answer to the appellant's argument that Ind. Ann. Stat. § 52-1131[8] (Burns), casts the burden on the county department of public welfare to bear the costs of major hospital care for indigents. The appellee says:

"Ind. Ann. Stat. § 52-1131 (Burns), does not afford any relief whatever to private hospitals. The wording of the statute shows that the relief is expressly limited to 'commitments' and to care rendered by 'public hospitals' or 'to any hospital operated by the Trustees of Indiana University'. There is therefore, absolutely no relief afforded the plaintiff in the instant case by Ind. Ann. Stat. § 52-1131 (Burns)."

---

8. § 52-1131.—Commitment to public hospitals by county department of public welfare—Procedure—The county department of public welfare of each county in this state is hereby empowered to commit to any public hospital in the county or to any public hospital in an adjacent county or to any hospital operated by the trustees of Indiana University, any person having a legal residence in such county, who shall appear to the satisfaction of the department after examination and upon recommendation of a physician or surgeon holding an unlimited license issued by the board of medical registration and examination of Indiana to practice medicine in this state, to be suffering from a disease, defect or deformity, which may be benefited by treatment in such hospital, provided such person, or anyone chargeable under the law with the responsibility of furnishing medical, surgical or hospital care for such person is not financially able to defray the necessary expense of such medical, surgical and hospital care. Upon filing of an application by any person requesting the county department of public welfare to furnish medical, surgical or hospital care as provided for in this act [§§ 52-1131—52-1143] the county department of public welfare shall investigate the financial resources of such applicant, or anyone chargeable under the law with the responsibility of furnishing medical, surgical or hospital care for such applicant; and if after such investigation, the county department of public welfare shall determine that such applicant, or anyone chargeable under the law with the responsibility of furnishing medical, surgical and hospital care for such applicant, is financially unable to defray the necessary expense of such medical, surgical and hospital care, the county department of public welfare may make such commitment as herein provided: Provided, That no person shall be committed to a public hospital of a county unless the daily charge for hospitalization at such hospital shall be less than that charged at an institution operated by the trustees of Indiana University. [Acts 1947, ch. 300, § 1, p. 1217; 1951, ch. 5 § 1, p. 8.].

While it is my opinion that we do not have a case before us in which we can so decide, it does appear that Burns § 52-1131 may have afforded the means by which the appellee could have prevailed upon the Allen County Department of Public Welfare to take Mrs. Hutchens off its hands by committing her to a public or state hospital, but I agree with appellee's counsel that it affords appellee no relief after appellee has furnished hospital care and is in quest of someone to pay the bill. The position taken by the majority, however, with respect to the township's obligation to volunteers, such as the appellee, casts a burden on the majority to consider whether § 52-1131, makes it the duty of the county welfare department to take over long-term hospital cases, such as this, and commit them to state institutions or public hospitals.

I allude to this argument between counsel concerning the provisions of § 52-1131, however, primarily for the purpose of illustrating that this case does not concern the relief of a poor person but, rather, the relief of a hospital. And I, unlike the majority, do not find it to be the public policy of this state to make it the duty of trustees to protect doctors, hospitals, or other institutions or persons against the consequences of having extended credit beyond the resources and ability of the debtor to pay, nor against the loss incurred by having performed acts of charity which could have, if preauthorized as such, been paid for as poor relief.

Exactly the opposite public policy is stated in sections 11 and 12 of the 1935 Poor Relief Act, being also Ind. Ann. Stat. §§ 52-154 and 155 (Burns), which read as follows:

52-154. Charitable societies—Duty of overseer.—It shall be the duty of each overseer to ascertain what societies for relief of the poor or other organizations for charitable purposes, if any, exist or are operating within the township of which he is trustee. Whenever the overseer of the poor finds such societies to exist, he shall make inquiry from the agents or members of the societies as to whom they are aiding in his township, and shall offer them any infor-

mation he possesses concerning the poor which may be of service to them, and shall ask them for such information regarding the poor and needy persons as they may be able to give him. [Acts 1935, ch. 116, § 11, p. 432.]

52-155. Overseer—Co-operation with relief societies—Relief duplication—Avoidance.—It shall be the duty of the overseer of the poor to acquaint himself, as far as possible, with the work of all such relief societies or other organizations for charitable purposes operating within his township, and to co-operate with them in any way he may deem advisable, to the end that the unnecessary duplication of relief may be avoided and the creation of new families of paupers through misguided and useless alms may cease. The overseer shall also seek the aid of such societies or organizations or their members in securing employment for those who apply to him, when they are found able to labor. [Acts 1935, ch. 116, § 12, p. 432.]

The notice given to the trustee later on by the appellee hospital's business manager added nothing significant to the so-called notice previously given by the patient's husband. The manager did not say to the trustee that Mrs. Hutchens was not receiving something she needed and that she would not receive it unless the trustee furnished it. He did not say to the trustee that the hospital would refuse to continue furnishing care to the patient unless the trustee issued his purchase order to the hospital.[9] That Mrs. Hutchens was still in the hospital and that it was a tough situation was the only information Mr. Baker's conversations added to what Mr. Hutchens had already told Mrs. Sunderland. Those conversations were essentially questions rather than notifications. He

---

9. Mr. Baker on cross examination as to why no written notice or no affidavit (Burns § 52-152 prohibits aid unless one is filed) was filed with the trustee, testified that the customary practice was for the trustee to issue a purchase order which the hospital would file. No mention was made of the customary practice when the purchase order was not issued. The business manager also testified that it was contrary to hospital rules and regulations to turn anyone away because the person could not pay, and that the hospital did a certain amount of charity work. There was no evidence whether appellee was a for-profit or a not-for-profit corporation. The complaint merely alleged (and the answer admitted) that appellee was an Indiana Corporation and that it was a hospital, located in appellant-township, licensed to care for "sick and disabled persons, including indigents".

asked her whether Mr. Hutchens had contacted the trustee and whether the trustee was going to render assistance. There was no evidence at all that the trustee was ever given any indication that the hospital or Mr. Hutchens would not accept as final the trustee's decision that no assistance would be rendered. None, that is, until appellee's attorneys sent the trustee the hospital bill in November, 1965, the month following the patient's death.

My attention has not been called to any case in any jurisdiction in which notice of the type given in this case has been held sufficient to create liability. My own research has revealed no such case. In the notice cases I have read, the notice has been unequivocal that the hospital was holding the relief officer or agency responsible and was affording care to the patient as a public charge, leaving no room for its ministrations to be considered acts of charity or carelessly extended credit. Needless to say, notice in those cases was in writing and squarely confronted the overseer of the poor (or his equivalent) with the necessity for action.[10] Appellee has not shown that the notice it gave to the trustee in this case was sufficient to create township liability under the law of any jurisdiction.

Again I wish to emphasize that my dissent does not advocate that we hold that an employed man who could not qualify as a poor person for the purchase of food, clothing and shelter can not, nevertheless, qualify as a poor person when the necessity arises for hospital and medical care for members of his family for which his income, property and credit are inadequate to pay. I do not suggest that we hold that insurance takes such a person out of the "poor person" category unless the insurance benefits are sufficient to enable him to assume the balance. Nor do I believe we should hold any-

10. *Rockford Memorial Hospital Association v. Whaples*, 25 Ill. App. 2d 79, 165 N. E. 2d 523 (1960); *Amsterdam City Hospital v. Gemmiti*, 29 Misc. 2d 67, 213 N. Y. S. 2d 955 (1961).

thing contrary to, nor do I intend to indicate any disagreement with, Judge Pfaff's opinion in *Parkview Memorial Hospital, Inc. v. County Department of Public Welfare of DeKalb County*, 134 Ind. App. 689, 191 N. E. 2d 116 (1963).

I would not hold that prior authorization by the township trustee is essential to liability for reasonably necessary hospital and medical care furnished to a poor person in an emergency and for the duration of the emergency, provided reasonable and timely notice is given to the trustee. Nor would I, in this case, hold that a township may not be liable for necessary hospital care furnished to a poor person in the face of the trustee's unjustifiable refusal to furnish such care, provided the volunteer who furnishes such care to such poor person gives timely and unequivocal notice to the trustee that the care is being furnished in expectation of payment by the township and not on the credit of someone legally obligated to support the indigent nor as a gift nor as an act of charity. This case is not such a case, and such a decision cannot here be made.

I would suggest, however, that the most satisfactory solution of disputes arising from alleged failure or refusal of poor relief or welfare agencies to properly and adequately supply the needs of the economically disadvantaged lies in a two-fold approach through legislation providing: First, a simple and expeditious administrative appeal with a quick and easy court review (perhaps in the nature of summary mandamus)[11] and, secondly, some provision for adequate and well publicized free legal assistance readily available to persons in need.

---

11. Something like this was provided in section 33 of the 1935 Poor Relief Act (Burns Ind. Stat. Ann. § 52-176) but Acts 1945, ch. 117, § 1 (Burns Ind. Stat. Ann. § 52-176a) nullified it as to township trustees.

Section 17 of the 1935 Act (Burns § 52-160), still in effect, reads:
"If any poor person believes he or she is entitled to the benefit of the laws for the relief of the poor, and the overseer of the poor of the township in which he or she has a legal residence shall refuse to give such person the benefit thereof, upon application of such person,

The majority's decision in this case, by abolishing prior authorization by the township trustee as a prerequisite to township liability for relief furnished a poor person, abolishes the need for any appeal from the trustee, if the poor person is fortunate enough to find a volunteer willing to rely on this decision in lieu of a trustee's purchase order. What that means, of course, is that the discretion which formerly resided in the trustee now resides in the volunteer. Doctors, hospitals, landlords, and grocers are now the true overseers of the poor. Charitable institutions no longer need to rely on contributions to finance their good works. The township must now reimburse them for all the relief they dispense (except such as may possibly be the liability of the county welfare department). If there are volunteers willing to take care of every legitimate need, the result may be socially desirable. Yet it seems to contemplate a rather chaotic governmental operation fraught with headaches for budget makers, record keepers, and examiners from the state board of accounts. And it does nothing but confuse the status and the remedy of those unfortunates whose plight is ignored by both the trustee and potential volunteers.

NOTE.—Reported in 246 N. E. 2d 391.

---

the board of county commissioners shall grant such poor person a hearing, and, in pursuance thereof, may, if it deem proper, direct the overseer to relieve him or her, on his or her application therefor."

Legislation providing an easy court review (with free legal counsel) of the commissioner's decision may be all the additional legislation needed. And it would seem, in the case at bar, that the appellee's failure to assist Mr. and Mrs. Hutchens in appealing to the county commissioners is an additional indication that appellee was not looking to the township to pay for Mrs. Hutchen's care.

Acts 1965, ch. 172 (Burns §§ 52-1146 through 52-1150) providing for hospitalization of injured indigents and ill non-resident indigents contains an expeditious administrative appeal and judicial review available to "the hospital or physician affected thereby".